IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HERO TIERA T. SMITH, f/k/a TIERA T.　）
SMITH,　）
　）
　　　Petitioner,　）
　）
　v.　）　C.A. No. 18-123 (MN)
　）
WENDI CAPLE, Warden, and ATTORNEY　）
GENERAL OF THE STATE OF　）
DELAWARE,　）
　）
　　　Respondents.　）

### MEMORANDUM OPINION

Hero Tiera T. Smith – *Pro se* Petitioner.

Kathryn Joy Garrison, Deputy Attorney General, Delaware Department of Justice, Wilmington, DE – Attorneys for Respondents.

March 31, 2021
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE:**

Pending before the Court is a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition") filed by Petitioner Hero Tiera T. Smith  ("Petitioner").  (D.I. 3).  The State filed an Answer in opposition, to which Petitioner filed a Reply.  (D.I. 19; D.I. 21).  For the reasons discussed, the Court will deny the Petition.

## I.     BACKGROUND

On July 27, 2007, Charles Smith (CJ) drove into the Seaford Meadows apartment complex. His girlfriend, Jalissa Cannon, was in the front seat next to him.  (D.I. 19 at 4).  Angel Blackwell and Ardelia Parker were sleeping in the backseat of CJ's car.  As CJ pulled into the complex, Petitioner was driving out.  They saw each other and stopped their cars side-by-side and facing in opposite directions.  Less than a minute later, Petitioner stood at CJ's door, reached her arm through his open window, and shot him three times at close range, killing him.  *Id.*

### A.     The Eyewitnesses

The police interviewed a number of eyewitnesses to the murder.  Jalissa Cannon (Jalissa) was initially interviewed at the scene.  (D.I. 17-9 at 8).  She also later gave a recorded statement and a written statement.  Jalissa said that after CJ turned into the Seaford Meadows entrance, he saw Petitioner in her car and said, "[t]here is the bitch that shot at us last night."  (D.I. 17-5 at 81). CJ stopped his car and Petitioner did the same.  (D.I. 17-5 at 83).  CJ asked Petitioner if, when she had pulled out a gun the night before, she had meant it for him.  (D.I. 17-5 at 83; D.I. 17-9 at 21). Petitioner replied no.  (*Id.*).  CJ put his car in drive and said, "[t]hat's okay because I don't play that gun stuff."  (*Id.*).  Petitioner then told CJ, "[i]f I pulled it out on you then I would have did it." (*Id.*).  Jalissa saw Petitioner reach underneath her seat and pull out a black gun.  (D.I. 17-9 at 21). Petitioner then got out of her car and walked to the driver's side of CJ's car.  (*Id.*).  CJ opened his door as if to get out.  (*Id.*).  Petitioner said, "[d]o you want me to shoot you?"  (*Id.*).  And then she

shot him.  (*Id*.).  CJ's door was open and he was trying to get back into the car.  (D.I. 17-9 at 8; D.I. 17-9 at 21).  Jalissa recognized Petitioner as someone she had seen around and identified her in a lineup.  (D.I. 17-5 at 82; D.I. 17-9 at 37).

Ardelia Parker ("Ardelia") and Angel Blackwell ("Angel") were both asleep in the back of CJ's car when the altercation began.  Both gave recorded and written statements to police.  (D.I. 17-9 at 20, 24, 26). Neither paid attention to the words exchanged between Petitioner and CJ before the shooting.  (*Id*.).  Ardelia heard gunshots and looked up to see Petitioner with her arm in the driver's side window.  (D.I. 17-9 at 26).  Ardelia saw that when Petitioner fired the second shot, CJ's hands were on the steering wheel.  (*Id*.).  After firing the third shot, Petitioner got in her car and left.  *Id*.  Angel did not see the shots fired but did see Petitioner leaning in the window afterwards.  (D.I. 17-9 at 20).  Petitioner then jumped in her car and left.  (D.I. 17-9 at 24, 26).  Both Ardelia and Angel recognized Petitioner from having seen her before and both identified her from a photo lineup.  (D.I. 17-9 at 20, 28).

Gerald Finkbinder (Finkbinder) and Patrick Gill (Gill), who were working at a job site in the apartment complex, both gave written and recorded statements.  (D.I. 17-9 at 19, 23, 30-31).  Finkbinder was unloading a truck when he heard a woman shouting.  (D.I. 17-9 at 23).  He walked around the truck and could see a black female out of her car yelling at a guy.  (*Id*.).  She then shot the guy through his car window three times.  (*Id*.).  The black female exited the parking lot in her car, almost running over Finkbinder.  (*Id*.).

Gill was standing in one of the apartment units under construction when he saw a black male and a black female having an altercation.  (*Id*.).  He could not hear what they said, but said the female was the aggressor.  (*Id*.).  The female got out of her car, fired three rounds into the male's car, and then got into her own car and drove off.  (*Id*.).

Zackery Nellams, who was also at the job site, gave only a written statement.  (D.I. 17-9 at 29).  He was standing at the back of a work truck when he heard a man and woman arguing.  (*Id*.).  He watched as the woman stepped out of her car and fired three shots at the man.  (*Id*.).  She then got back into her car and sped off.  (*Id*.).

None of the eyewitnesses saw CJ with a gun.  (*See* D.I. 17-17 at 47-53).

### B.      The Surveillance Video

Seaford Meadow apartments had several video surveillance cameras.  (D.I. 19 at 6).  One of those cameras recorded the events surrounding the shooting.  (*Id*.).  "The video shows [CJ] sitting in his car and Petitioner standing outside the door of the [CJ's] car.  The video further shows Petitioner then getting back in her car and driving away with nothing blocking her flight."  *State v. Smith*, 2017 WL 902149, at *10 (Del. Super. Ct. Mar. 6, 2017), *aff'd*, 177 A.3d 613 (Del. 2018).

### C.      Petitioner's Statements

After the shooting, Petitioner fled the State.  An acquaintance, Ambria Smith (Ambria), drove Petitioner to Salisbury, Maryland.  (D.I. 17-17 at 37-38).  Petitioner told Ambria that CJ had asked her whether the shot the day before had been meant for him.  (*Id*.).  Petitioner said CJ then kicked his car door open and it looked like he was going for something, so she shot him.  (*Id*.).  On July 30, 2007, Petitioner was arrested in Tift County, Georgia.  (D.I. 17-14 at 65).  While being escorted by the county officers, Petitioner told them that she had killed CJ in self-defense.  (*Id*.).  On August 8, 2007, an investigator from the Office of the Public Defender (OPD) interviewed Petitioner.  (*Id*.).  According to the investigator's notes, Petitioner told him:

> While exiting the apt. complex, her vehicle was blocked by (V's) vehicle.  At this time, she says that she became frighten [sic] [and] did not know what was taking place. [CJ] Smith open [sic] his door [and] started yelling something unk. [and] he was looking very upset. Def. [sic] then closed his veh. door [and] reached under the passenger side front seat, still blocking her vehicle/ she could not go any place. Says that she became more fearful for her life [and]

> thought that he was trying to get a gun. Simultaneously as (V) was
> rising back up, she fired her pistol into (V) vehicle, but does not
> recall how many times [and] did not realize that she had struck him.

(D.I. 17-5 at 87).

On August 16, 2007, the date of her preliminary hearing, Petitioner met with her defense counsel. (D.I. 17-9 at 32-39). She told counsel that, on the morning of the shooting, CJ had pulled his car alongside hers and had said, "[b]itch, you pulled a gun on me last night." (D.I. 17-9 at 34). He got out of his car and was coming at her. (D.I. 17-9 at 34). She reached under her seat for her gun. (D.I. 17-9 at 35). Then CJ got back into his car and leaned down towards the passenger seat. (*Id*.). Petitioner shot him because she thought she saw that he had a gun. (D.I. 17-9 at 35). During the preliminary hearing, defense counsel also learned that there were several eyewitnesses and that the shooting had been captured on video. (D.I. 17-5 at 90). In a letter, dated September 27, 2007, sent to defense counsel, Petitioner reiterated that she had been acting in self-defense and that when she saw CJ "with his gun approaching [her]," she acted on impulse. (D.I. 17-5 at 91).

On November 26, 2007, Petitioner was indicted on nine offenses: one count each of first degree murder, first degree assault, and possession of a deadly weapon by a person prohibited (PDWBPP); two counts of first degree reckless endangering; and four counts of possession of a firearm during the commission of a felony (PFDCF). (D.I 19 at 1). Petitioner filed a motion to sever the PDWBPP charge, which the Superior Court granted. (*Id*.).

### D. Psychological Evaluation

Sometime in late April or early May of 2008, defense counsel retained the services of Joseph C. Zingaro, Ph.D., to perform a psychological evaluation of Petitioner. (D.I. 17-5 at 100; D.I. 17-6 at 29-30). Dr. Zingaro met with Petitioner on May 8, 2008, and reviewed records pertaining to her, including school records and prior mental health screenings. (D.I. 17-5 at 92). Dr. Zingaro created a comprehensive report about Petitioner in which he noted: (1) her childhood

was marked by being the victim of sexual abuse on several occasions by at least two different perpetrators (D.I. 17-5 at 94, 96-97); (2) she received very limited counseling for the sexual abuse (D.I. 17-5 at 96, 98-99); (3) she never had a relationship with her mother, who had been incarcerated for drug-related crimes (D.I. 17-5 at 98); (4) she was raised by several different people in Delaware and Georgia, some of whom exposed her to illegal substances and alcohol at a young age (D.I. 17-5 at 94, 98); (5) she reported she had been robbed twice, once at gunpoint, while selling drugs (D.I. 17-5 at 94, 99); (6) she attempted to commit suicide as an adolescent (D.I. 17-5 at 95); (7) she might have suffered from Fetal Alcohol Syndrome because her mother used drugs and alcohol during pregnancy (D.I. 17-5 at 96); (8) she had been diagnosed in 2004 with Conduct Disorder, Cannabis Abuse and "Rule Out Traits of Post Traumatic Stress Disorder" (*Id*.); and (9) she met criteria for Major Depression, Panic Disorder and Social Anxiety Disorder (D.I. 17-5 at 97).

Petitioner also discussed the shooting with Dr. Zingaro, telling him that she had hung out with CJ and that he had accused her of shooting at him the night before. (D.I. 17-5 at 95). Petitioner remembered CJ getting out of his car and coming for her, but when asked if he was armed, she replied that she did not see anything in his hand. (*Id*.). CJ returned to his car and when she saw him bend over, she thought he was reaching for a weapon, so she got out of her car and shot him. (*Id*.). Petitioner also stated that CJ had used his car to block her in the parking lot, leaving her no way to escape. (D.I. 17-5 at 99-100).

### E.    Petitioner's Guilty Plea

On August 22, 2008, Petitioner pleaded guilty to second degree murder and other charges. During the plea colloquy, Petitioner confirmed to the trial court that she understood the nature of her charges and the maximum periods of incarceration that she faced. (D.I. 17-9 at 45). She also agreed that no one had forced her to take the plea. (D.I. 17-9 at 46). When the trial court asked

her if she committed the four offenses to which she was pleading guilty, Petitioner responded,

"yes." (*Id.*). In addition, Petitioner told the court she was satisfied with her attorney's

representation and she was certain that this plea was how she wished to resolve her criminal

charges. (*Id.*). The trial court accepted Petitioner's plea as knowingly, voluntarily and intelligently

entered. (D.I. 17-9 at 46-47).

### F.      The Presentence Investigation

Prior to sentencing, the sentencing court ordered a Presentence Investigation Report ("PSI

Report"). (D.I. 17-6 at 1-22). In preparing the PSI Report, the presentence investigator reviewed

records, including the police reports and Petitioner's mental health records, and the investigator

interviewed Petitioner. (D.I. 17-6 at 3-12; D.I. 17-6 at 18). Petitioner told the investigator that,

on the day of the shooting, she was heading out of the Seaford Meadow apartment complex when

CJ was driving in:

> C.J. pulled his car in front of mine, blocking my exit. I stopped and
> then he pulled up beside me. There was about five feet between our
> vehicles as we were parked side by side in opposite directions. C.J.
> said, "You pulled a gun out on me last night." I said, "What are you
> talking about." C.J. seemed very upset at this point. I reached under
> my seat, got my gun and sat the gun on my lap. I then said, "What
> makes you think I would pull a gun out on you?" C.J. kept cussing
> and calling me a bitch. C.J. had gotten out of his car and was
> standing just outside the driver's door at this point. He then sat back
> inside the car leaving his door open. I then saw his foot go up in the
> air and he was leaning toward the passenger side of his car. I
> automatically thought he was going after a gun. I jumped out of my
> car, standing just outside my door and started shooting at him. I
> think I fired two or three shots.

(D.I. 17-6 at 10). Petitioner also said that she had never seen CJ with a gun before and that she

considered him a friend, whom she saw every day, and with whom she had never before had an

argument. (D.I. 17-6 at 11). The presentence investigator attached the police report, the autopsy

report, witness statements, video analysis report of the scene, Dr. Zingaro's report, and other materials as exhibits to the PSI Report.  (D.I. 17-6 at 18).

### G.    Sentencing

At sentencing, defense counsel asked the court to rely on the Delaware Sentencing and Accountability Commission's presumptive sentences in sentencing Petitioner.  (D.I. 17-3 at 35-36).  Defense counsel emphasized Petitioner's young age at the time of the shooting (19); told the court that Petitioner mistakenly believed she was in fear of serious harm when she shot CJ; referred to Dr. Vingaro's report and mentioned Petitioner's traumatic background, which included sexual abuse; and discussed Petitioner's remorse for the shooting. (D.I. 17-3 at 32-35).   Petitioner apologized to CJ's family and asked for their forgiveness. (D.I. 17-3 at 37).  CJ's father addressed the sentencing court and talked about the loss of his only son.  (D.I. 17-3 at 37-42).  The sentencing court was not swayed by the mitigating evidence presented and sentenced Petitioner to life plus 75 years.  (D.I. 17-3 at 46-47).

### H.    Direct Appeal

Petitioner filed a *pro se* notice of appeal in January 2009.  (D.I. 17-3 at 50-52).  Soon thereafter, however, Petitioner filed a motion to dismiss her appeal through her defense counsel. (D.I. 17-3 at 54-58).

### I.    Post-Conviction Motions

Defense counsel filed a motion to modify Petitioner's sentence, which the Superior Court denied on March 30, 2009.  (D.I. 17-3 at 59-64).  On April 1, 2014, Petitioner filed in the  Superior Court an initial *pro se* motion for postconviction relief under Delaware Superior Court Criminal Rule 61 ("Rule 61 motion").  (D.I. 17-3 at 65-69). Counsel was appointed to represent Petitioner, and on June 15, 2015, her post-conviction counsel filed an amended Rule 61 motion.  (D.I. 17-3 at 70-143).

Petitioner's former defense counsel responded to the factual allegations of ineffective assistance of counsel contained in the original 2014 Rule 61 motion and the 2015 amended Rule 61 motion by affidavit on September 21, 2015.  (D.I. 17-4 at 1-6).  The State filed a response to Petitioner's Rule 61 original and amended motions, and Petitioner filed a reply.  (D.I. 17-4 at 7-64).

The Superior Court held an evidentiary hearing on June 1, 2 and 13, 2016, and the parties filed post-hearing briefs.  (D.I. 17-4 at 65-432).  The Superior Court denied Petitioner's Rule 61 motion on March 6, 2017.  (D.I. 17-5 at 1-80); *State v. Smith*, 2017 WL 902149 (Del. Super. Ct. Mar. 6, 2017).  The Delaware Supreme Court affirmed that decision on January 2, 2018.  *See Smith v. State*, 2018 WL 266838 (Del. Jan. 2, 2018).

Petitioner filed the instant *pro se* habeas Petition in January 2018, asserting four grounds for relief: (1) defense counsel provided ineffective assistance by  failing to investigate her claim of self-defense (D.I. 3 at 6); (2) her second degree murder sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment (*Id*. at 8); (3) defense counsel provided ineffective assistance by failing to appeal her sentence and by failing to adequately argue her motion for modification of sentence (*Id*. at 9); and (4) defense counsel provided ineffective assistance by failing to adequately investigate and present mitigating evidence at her sentencing (*Id*. at 11).

## II.   <u>ONE YEAR STATUTE OF LIMITATIONS</u>

AEDPA prescribes a one-year period of limitations for the filing of habeas petitions by state prisoners, which begins to run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  AEDPA's limitations period is subject to statutory and equitable tolling. *See Holland v. Florida*, 560 U.S. 631 (2010) (equitable tolling); 28 U.S.C. § 2244(d)(2) (statutory tolling).

Petitioner does not assert, and the Court cannot discern, any facts triggering the application of § 2244(d)(1)(B), (C), or (D).  Consequently, the Court concludes that the one-year period of limitations began to run when Petitioner's convictions became final under § 2244(d)(1)(A).

Pursuant to § 2244(d)(1)(A), if a state prisoner does not appeal a state court judgment, the judgment of conviction becomes final, and the one-year period begins to run, upon expiration of the time period allowed for seeking direct review.  *See Kapral v. United States*, 166 F.3d 565, 575, 578 (3d Cir. 1999); *Jones v. Morton*, 195 F.3d 153, 158 (3d Cir. 1999).  If a state prisoner appeals a state court judgment but does not seek certiorari review, however, the judgment of conviction becomes final upon expiration of the ninety-day time period allowed for seeking certiorari review. *See Kapral*, 166 F.3d at 575, 578; *Jones*, 195 F.3d at 158.

Here, the Delaware Superior Court sentenced Petitioner on December 5, 2008.  Although Petitioner filed a notice of appeal, she moved to voluntarily dismiss the appeal.  The Delaware Supreme Court granted the motion to dismiss on January 29, 2009.  In these circumstances, the Court concludes that Petitioner's conviction became final on January 29, 2009. *See, e.g., U.S. v.*

*Sylvester*, 2006 WL 695796, at *2-3 (M.D. Pa. Mar. 17, 2006) (explaining that a voluntary dismissal of an appeal renders a petition for a writ of certiorari unavailable, and thus, the judgment of conviction becomes final at the point of voluntary dismissal, not ninety-days later).   Applying the one-year limitations period to that date, Petitioner had until February 1, 2010, to timely file her Petition.[1]  *See Wilson v. Beard*, 426 F.3d 653 (3d Cir. 2005) (holding that Federal Rule of Civil Procedure 6(a) and (e) applies to federal habeas petitions); *Phlipot v. Johnson*, 2015 WL 1906127, at *3 n.3 (D. Del. Apr. 27, 2015) (AEDPA's one-year limitations period is calculated according to the anniversary method, *i.e.*, the limitations period expires on the anniversary of the date it began to run).  Petitioner, however, did not file the instant Petition until January 15, 2018,[2] approximately eight years after that deadline.  Thus, the Petition is time-barred and should be dismissed, unless the limitations period can be statutorily or equitably tolled.  *See Jones,* 195 F.3d at 158.  The Court will discuss each doctrine in turn.

### A.      Statutory Tolling

Pursuant to § 2244(d)(2), a properly filed state post-conviction motion tolls AEDPA's limitations period during the time the motion is pending in the state courts, including any post-conviction appeals, provided that the motion was filed and pending before the expiration of AEDPA's limitations period.  *See Swartz v. Meyers*, 204 F.3d 417, 420-24 (3d Cir. 2000).  An untimely post-conviction motion is not considered to be properly filed for § 2244(d)(2) purposes.

---

[1]      The one-year period actually expired on a weekend. Therefore, the deadline extended through the end of the day on Monday, February 1, 2010.  *See* Fed. R. Civ. P. 6(a)(3).

[2]      Applying the prisoner mailbox rule, the Court adopts January 15, 2018 as the filing date, because that is the date on the Petition.  (D.I. 1at 18); *see Longenette v. Krusing*, 322 F.3d 758, 761 (3d Cir. 2003) (the date on which a prisoner transmitted documents to prison authorities for mailing is to be considered the actual filing date).

*See Pace v. DiGuglielmo*, 544 U.S. 408, 414, 417 (2005) (explaining that a state postconviction petition rejected by the state court as untimely is not "properly filed" within the meaning of § 2244(d)(2)). The limitations period is also tolled for the time during which an appeal from a post-conviction decision could be filed even if the appeal is not eventually filed. *Id*. at 424. The limitations period, however, is not tolled during the ninety days a petitioner has to file a petition for a writ of certiorari in the United States Supreme Court regarding a judgment denying a state post-conviction motion. *See Stokes v. Dist. Attorney of Philadelphia*, 247 F.3d 539, 542 (3d Cir. 2001).

The one-year limitations period began to run in this case on January 30, 2009. When Petitioner filed her motion to modify sentence on February 27, 2009, twenty-eight days of the limitations period had already expired. The Superior Court denied the motion to modify sentence on March 30, 2009, and Petitioner did not appeal that decision. As a result, the motion to modify tolled the limitations period from February 27, 2009 through April 29, 2009, the date on which the thirty-day deadline to appeal expired. The limitations clock started to run again on April 30, 2009, and ran the remaining 337 days without interruption until it expired on April 2, 2010. Consequently, the Petition is time-barred, unless equitable tolling applies.

### B.     Equitable Tolling

The one-year limitations period may be tolled for equitable reasons in rare circumstances when the petitioner demonstrates "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649-50. With respect to the diligence inquiry, equitable tolling is not available where the late filing is due to the petitioner's excusable neglect. *Id*. at 651-52. As for the extraordinary circumstance requirement, "the relevant inquiry is not whether the circumstance alleged to be extraordinary is unique to the petitioner, but how severe an obstacle it creates with respect to

meeting AEDPA's one-year deadline." *Pabon v. Mahanoy*, 654 F.3d 385, 401 (3d Cir. 2011). An extraordinary circumstance will only warrant equitable tolling if there is "a causal connection, or nexus, between the extraordinary circumstance [] and the petitioner's failure to file a timely federal petition." *Ross v. Varano*, 712 F.3d 784, 803 (3d Cir. 2013). Specifically, "if the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing." *Brown v. Shannon,* 322 F.3d 768, 773 (3d Cir.2003). The burden is on the petitioner to prove that she has been reasonably diligent in pursuing her rights. *See Urcinoli v. Cathel,* 546 F.3d 269, 277 (3d Cir. 2008).

Petitioner asserts that the limitations period should be equitably tolled because her "attorney was ineffective at all stages of [her] case" by not preserving her appeal rights, and "no one told [her she] could" file a federal habeas petition. (D.I. 3 at 14-15). She also contends that the limitations period should be viewed as starting when the Delaware Supreme Court issued its post-conviction decision, because the state courts did not dismiss her Rule 61 motion as untimely. (D.I. 21 at 7-8).

The Supreme Court has recognized that an attorney's egregious error or neglect may constitute an extraordinary circumstance for equitable tolling purposes. *See Holland*, 560 U.S. at 635-54. An "egregious error" generally includes instances where an attorney fails to file an appeal after an explicit request from the petitioner, *see Velazquez v. Grace*, 277 F. App'x 258 (3d Cir. 2008), "affirmatively deceives the petitioner about filing a direct appeal," or "persistently neglects the petitioner's case." *Schlueter v. Varner*, 384 F.3d 69, 76-77 (3d Cir. 2004). An appellate counsel's decision regarding which issues to raise on appeal is strategic, *see Buehl v. Vaughn*, 166 F.3d 163, 174 (3d Cir. 1999), and appellate counsel is not required to raise every possible non-

frivolous issue.  *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal").

The State asserts that, even assuming that defense counsel's conduct was so egregious that it rose to the level of extraordinary circumstances,[3] Petitioner's failure to demonstrate how defense counsel's actions prevented her from filing the instant Petition for almost nine years precludes the application of the equitable tolling doctrine.  Although the Court is inclined to concur with the State's assertion, the Court also notes that AEDPA's limitations period is not jurisdictional.  *See Holland v. Florida*, 560 U.S. 631, 645 (2010).  Significantly, although Petitioner's Rule 61 motion was clearly time-barred, the Superior Court declined to dismiss the Rule 61 motion as untimely and reviewed it on the merits after finding that Petitioner "alleged enough facts, if true, to make procedural dismissal inappropriate under Rule 61(i)(1)." *Smith*, 2017 WL 902149, at *2. Given these circumstances, the Court will exercise prudence, refrain from dismissing the Petition as time-barred, and address the claims in the Petition.

## III.    <u>STANDARD OF REVIEW</u>

A state petitioner seeking habeas relief must exhaust all remedies available in the state courts.  *See* 28 U.S.C. 2254(b); *Rose v. Lundy*, 455 U.S. 509, 510 (1982).  The purpose of the exhaustion doctrine is "to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  A claim is exhausted if it has been fairly presented to the state's highest court.  *See Castille v. Peoples*, 489 U.S. 346, 351 (1989).

---

[3]      As discussed later in the Opinion, the Court concludes that defense counsel's failure to file an appeal did not amount to ineffective assistance.  *See infra* at  Section IV. A.2.

When a state's highest court has adjudicated a federal habeas claim on the merits,[4] the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).  Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the state court proceeding.  28 U.S.C. § 2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).  The deferential standard of § 2254(d) applies even when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied.  *See Harrington v. Richter*, 562 U.S. 86, 98-101 (2011).  As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id.* at 99.

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 413.  The mere failure to cite Supreme Court precedent does not require a finding that the decision is contrary to clearly established federal law.  *See Early v. Packer*, 537 U.S. 3, 8 (2002).  For instance, a decision may comport with clearly established federal law even if the decision does not demonstrate an awareness of relevant Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Id*.  In turn, an "unreasonable application" of clearly established federal law occurs when

---

[4]     A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground.  *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

a state court "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of a prisoner's case." *Williams*, 529 U.S. at 413; *see also White v. Woodall*, 572 U.S. 415, 426 (2014).

Finally, when performing an inquiry under § 2254(d), a federal court must presume that the state court's determinations of factual issues are correct. *See* 28 U.S.C. § 2254(e)(1); *Appel*, 250 F.3d at 210. This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## IV.   DISCUSSION

Petitioner presented all four of her claims to the Superior Court in her amended Rule 61 motion and to the Delaware Supreme Court on post-conviction appeal. (D.I. 17-2; D.I. 17-3 at 70-143). The Superior Court rejected the Claims as meritless, and the Delaware Supreme Court affirmed that decision "on the basis of and for the reasons assigned by the Superior Court in its memorandum opinion of March 6, 2017." *Smith*, 2018 WL 266838, at *1. Consequently, Petitioner will only be entitled to relief if the Superior Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

### A.   Claims One, Three, and Four:  Ineffective Assistance of Counsel

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective

standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* A petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). In the context of a guilty plea, a petitioner satisfies *Strickland*'s prejudice prong by demonstrating that, but for counsel's error, there is a reasonable probability that he would have insisted on proceeding to trial instead of pleading guilty. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985). A court can choose to address the prejudice prong before the deficient performance prong, and reject an ineffective assistance of counsel claim solely on the ground that the defendant was not prejudiced. *See Strickland,* 466 U.S. at 698. Finally, although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

With respect to the first prong of the § 2254(d)(1) inquiry, a "state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court precedent, or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by the Supreme Court." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). In this case, the Superior Court's decision was not contrary to clearly established federal law because it correctly

identified the *Strickland/Hill* standard applicable to Claims One, Three, and Four.[5]   *See Fahy v. Horn,* 516 F.3d 169, 196 (3d Cir.2008) (Pennsylvania Supreme Court's decision was not "contrary to" clearly established federal law because it appropriately relied on its own state court cases, which articulated the proper standard derived from Supreme Court precedent); *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The Court must also determine if the Superior Court reasonably applied the *Strickland/Hill* standard to the facts of Petitioner's case.  When performing the second prong of the § 2254(d)(1) inquiry, the Court must review the Delaware state court's decision with respect to Petitioner's ineffective assistance of counsel claim through a "doubly deferential" lens.[6]   *See Richter*, 562 U.S. at 105.  Notably, when § 2254(d)(1) applies, "the question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id*.  When assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable."  *Id*.  And finally, when viewing a state court's determination that a *Strickland* claim lacks merit

---

[5]   The Superior Court cited *Strickland* and the Delaware Supreme Court decision in *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012), which referenced the *Hill* decision.  *See Smith*, 2017 WL 902149, at *2 n. 10, 12, 15.

[6]   As explained by the *Richter* Court,
> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).

*Richter*, 562 U.S. at 105 (internal citations omitted).

through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id*. at 101.

### 1.    Claim One: Self-Defense

In Claim One, Petitioner contends that defense counsel provided ineffective assistance by failing to investigate her self-defense claim and interview witnesses from a list she provided. (D.I. 6 at 17).  Based on the allegations in her Rule 61 motion, Petitioner appears to argue that defense counsel failed to (1) interview witnesses whom Petitioner had told she had acted in self-defense (D.I. 17-3 at 80-81); (2) interview eyewitnesses to the crime (D.I. 17-3 at 81-82); and (3) interview witnesses who could have provided information about Petitioner's state of mind at the time of the shooting, *i.e*., that she generally feared for her safety because she had been sexually abused growing up, she was a drug dealer who had been robbed at gunpoint before, and she had been threatened by Tehron West, the father of her girlfriend's child (D.I. 17-3 at 83-89).

In Petitioner's Rule 61 proceeding, the Superior Court summarized the evidence as follows:

> When you boil it all down the evidence shows that 1) the Victim and [Petitioner] got into a verbal altercation where one of the Shooting Witnesses said that [Petitioner] was the aggressor, 2) [Petitioner] got her gun from under the seat of her car, 3) [Petitioner] then got out of her car and walked over to the Victim's car and pointed her gun at the Victim and stated "You want me to shoot you?", 4) [Petitioner] then stuck her gun through the Victim's open car window and shot the unarmed Victim three times while he had his foot mashed on his car's accelerator trying to get away from her, and 5) Smith then got back in her car and fled so quickly that she nearly ran over a man unloading a truck near the parking lot's exit.

*Smith*, 2017 WL 902149, at *8.  The Superior Court also noted (1) there was no evidence that CJ had a gun; (2) none of the witnesses heard CJ threaten Petitioner; (3) the apartment's surveillance video clearly showed Petitioner's car was not blocked in; (4) CJ was shot once in the back and appeared to be trying to get away from Petitioner; (5) Petitioner and CJ were friends; (6) Petitioner's evidence about her state of mind did not justify her shooting of CJ because none

of it related to their relationship; and (7) after the shooting Petitioner fled on a bus to Georgia.  *Id.*
at *8-12.  In turn, during the Rule 61 hearing, defense counsel testified: "At some point, . . . I think
the strategic focus shifted and in my mind it was, do we risk going to trial on a defense that I
believed would be impeachable and/or do I approach the State and attempt to negotiate a plea that
did not expose her to an automatic life sentence." ( D.I. 17-4 at 176).

Relying on the foregoing record, the Superior Court denied Claim One as meritless,
explaining:

> Trial Counsel correctly assessed [Petitioner's] self-defense claim
> when he concluded that it was not likely to succeed at trial. Trial
> Counsel's failure to interview the Shooting and Non–Shooting
> Witnesses made no difference because they did not help
> [Petitioner's] self-defense claim. Contrary to what [Petitioner]
> alleges, Trial Counsel did have psychological information available
> to him to support [Petitioner's] explanation of why she thought she
> was acting in self-defense. Trial Counsel never had to use it because
> [Petitioner] chose to plead guilty instead of going to trial.
> [Petitioner's] subjective state of mind was undermined by her
> objective consciousness of guilt, as evidence by her flight.
> [Petitioner's] self-defense claim was further undermined by the fact
> the Victim's car was not blocking her car in. [Petitioner] did not
> have to shoot the Victim. [Petitioner] could have safely driven away.
> I have concluded that Trial Counsel's representation of [Petitioner]
> did not leave her with no choice but to plead guilty.

*Smith*, 2017 WL 902149, at *8.

In order to assess the credibility of Petitioner's self-defense claim and its likelihood of
success at trial, it is necessary to understand Delaware's law on self-defense, *i.e.*, the justifiable
use of deadly force.  Section 464(c) of the Delaware Criminal Code provides that the use of deadly
force is justifiable "if the defendant believes that such force is necessary to protect the defendant
against death, serious physical injury, kidnapping or sexual intercourse compelled by force or
threat."  11 Del. Code § 464(c).  Section 464 also provides, however, that the use of deadly force
is not justifiable if "(1) [t]he defendant, with the purpose of causing death or serious physical

injury, provoked the use of force against the defendant in the same encounter; or (2) [t]he defendant knows that the necessity of using deadly force can be avoided with complete safety by retreating. . . ."  *Id.*  Delaware applies a subjective test to determine whether the defendant believed the use of force was necessary for protection.  *See Zuppo v. Carroll*, 458 F.Supp.2d 216, 230 (D. Del. 2006); *Coleman v. State*, 320 A.2d 740, 743 (Del. 1974).  Nevertheless, "the 'reasonable man' test is retained as a factor to be considered with all the others in the determination of the issue of justification."  *Coleman*, 320 A.2d at 743.

Notably, under Delaware law, the use of deadly force is not justified when the defendant can safely retreat.  In this case, the witnesses to the shooting and the surveillance video provided overwhelming evidence that Petitioner was the aggressor and could have retreated without using deadly force.  The fact that Petitioner could have retreated is further supported by the fact that she was able to speed away after the shooting without being hindered in her efforts to flee the scene.  Viewing these facts in addition to the rest of the record, the Court concludes that the Superior Court reasonably determined the facts in finding that Petitioner's claim of self-defense lacked credibility and was unlikely to succeed at trial.

Given this determination, the Court further concludes that the Superior Court reasonably applied *Strickland* in holding that defense counsel's decision not to conduct additional investigation of Petitioner's claim of self-defense and, to instead seek a plea, was objectively reasonable based on the evidence he had.  *See Strickland*, 466 U.S. at 690-91 (explaining "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").  If Petitioner had proceeded to trial, she risked being found guilty of

first degree murder and would have received a mandatory life sentence.  By entering a guilty plea, Petitioner could have received a much shorter sentence of twenty-three years.[7]

In addition, Petitioner's claim that she was prejudiced by defense counsel's deficient performance, *i.e.*, that she would have taken the case to trial had he investigated her self-defense claim, is undermined by the long odds she faced if she had done so.  As the United States Supreme Court recently noted in *Lee v. United States*:

> A defendant without any viable defense will be highly likely to lose at trial.  And a defendant facing such long odds will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial. [. . .] [D]efendants obviously weigh their prospects at trial in deciding whether to accept a plea.  Where a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea if the Government offers one.

*Lee v. United States*, 137 S.Ct. 1958, 1966 (2017) (internal citations omitted).

Looking through the doubly deferential lens applicable to ineffective assistance of counsel claims on federal habeas review, the Court concludes that the Superior Court reasonably applied the *Strickland/Hill* standard in denying Claim One.  Accordingly, the Court will deny Claim One.

### 2.      Claim Three: Failure to Appeal

Following her sentencing, Petitioner filed a *pro se* notice of appeal.  (D.I. 17-3 at 50-52). After discussing the appeal with defense counsel, Petitioner decided to dismiss her appeal and

---

[7]      *Cf. Lewis v. Mazurkiewicz*, 915 F.2d 106, 114–15 (3d Cir. 1990) (finding counsel's recommendation of guilty plea reasonable because counsel believed defendant's self-defense claim would fail); *Walker v. Pennsylvania*, 2015 WL 4770664, at *32 (E.D. Pa. Aug. 12, 2015) (finding state court did not unreasonably find defendant not prejudiced by counsel's failure to introduce expert mental health testimony regarding imperfect belief self-defense, in part, because defendant did not demonstrate a jury would have believed his mistaken perception given that no gun was ever found near victim and he went to victim's house armed with loaded weapon); *Urzua v. Klem*, 2003 WL 22427756, at *8 (E.D. Pa. Oct. 2, 2003) (finding state court reasonably rejected defendant's ineffective assistance of counsel claim for failure to explain entry of plea would result in waiver of self-defense claim because there was a very real possibility that a jury would have rejected the defense).

instead file a motion for reduction/modification of sentence.  (D.I. 17-3 at 54-64).  In his Rule 61

affidavit, defense counsel stated that he had discussed an appeal with Petitioner and realized that

her true goal was to have her sentence reduced.  (D.I. 17-4 at 4).  Defense counsel filed a motion

for reduction of sentence on February 27, 2009.  (D.I. 17-1 at 5, Entry No, 46; D.I. 17-3 at 60-62).

The Superior Court denied the motion on March 30, 2009, stating: "[y]our request for modification

of sentence file on 2/27/09 has been denied.  I remain satisfied that the sentence imposed on

12/5/08 is appropriate."  (D.I. 17-1 at 5, Entry No. 47).

In Claim Three, Petitioner contends that defense counsel provided ineffective assistance

by failing to pursue a direct appeal and by failing to present an adequate motion for reduction of

sentence.  Petitioner contends that the motion to reduce sentence was inadequate because defense

counsel did not include any new arguments to support a reduction of sentence; rather, he reasserted

the previous unsuccessful arguments he presented at sentencing.

Under Delaware law, appellate review of a sentence is limited to a determination as to

whether the sentence is within the statutory limits or "whether it is based on factual predicates

which are false, impermissible, or lack minimal reliability, judicial vindictiveness or bias, or a

closed mind."  *Kurzmann v. State*, 903 A.2d 702, 714 (Del. 2006).  "A judge sentences with a

closed mind when the sentence is based on a preconceived bias without consideration of the nature

of the offense or the character of the defendant."  *Weston v. State*, 832 A.2d 742, 746 (Del. 2003).

Moreover, "a defendant has no legal or constitutional right to appeal a statutorily authorized

sentence simply because it does not conform to the sentencing guidelines established by the

Sentencing Accountability Commission."  *Mayes v. State*, 604 A.2d 839, 845 (Del. 1992). *Accord*

*Morris v. State*, 2014 WL 641988, at *1 (Del. Feb. 6, 2014).

Here, the Superior Court denied Petitioner's complaint about defense counsel's failure to

file a direct appeal, explaining: "[defense] counsel had no reason to conclude that a claim attacking

the sentence would have been successful simply because it deviated from the sentencing guidelines. [Petitioner's] sentence was within the statutory limits." *Smith*, 2017 WL 902149, at *20. Because Petitioner's sentence was within the statutory limits, defense counsel would have been limited to arguing on appeal that the trial court sentenced Petitioner with a closed mind or bias, or that it based its decision on facts that were false, impermissible, or lacked minimal reliability. In her Rule 61 motion, Petitioner actually did contend that the trial court sentenced her with a closed mind, but the Superior Court rejected that assertion as belied by the record. For instance, in addressing the Rule 61 motion, the Superior Court provided the following explanation on how the sentence was determined:

> Before I sentenced [Petitioner], I reviewed the presentence report and considered Trial Counsel's comments, [Petitioner's] expression of sorrow to the Victim's family and request for forgiveness from them, and the Prosecutor's comments. It was only after considering all of that information that I decided upon [Petitioner's] sentence. I had a tremendous amount of information about the shooting and [Petitioner's] background. When I boiled it all down, I reached two conclusions. One, [Petitioner], instead of simply driving away, got out of her car and walked over to the Victim's car and shot him three times while he was frantically trying to get away from her. Two, [Petitioner] had a terrible childhood. There is no shortage of aggravating and mitigating evidence in this case. Indeed, I discussed much of it before in this decision. For example, [Petitioner] was undoubtedly a violent person. The night before [Petitioner] shot the Victim, she had shot a gun into the air in a parking lot full of people, screaming "I ain't never scared," and "You don't want it with me." The next day, before shooting the Victim while he was in his car with his girlfriend and two other friends, [Petitioner] pointed the gun at the Victim and said, "You want me to shoot you?" [Petitioner] then shot the Victim three times, one of which was in the back. [Petitioner's] life was no doubt terrible. The very people who were supposed to take care of her did not. Worse, they exposed her to drugs and did nothing when she complained about being sexually abused by her caretaker's boyfriend and others. No child should have to grow up this way. Sadly, many do. However, to argue that I did not take into consideration the aggravators and mitigators because I did not place them on the record is simply not the case.

> In my final analysis, I considered that, despite the many difficulties
> that [Petitioner] had faced in her life, she should spend her life in
> jail for murdering an innocent man who was, according to her, a
> friend that she saw daily and never had a problem with. Quite
> simply, [Petitioner] shot her friend because he had hollered at her
> for discharging a gun in front of his car while he sat in it the night
> before. Others may well have reached a different conclusion, but
> that does not mean that I did not give consideration to the facts of
> the case and [Petitioner's] background. I fully understood that I gave
> [Petitioner] the maximum sentence and that it is a long one.

*Smith*, 2017 WL 902149, at *21.  The Superior Court then specifically addressed each of the factors

that had not been explicitly mentioned when originally issuing the sentence in order to demonstrate

that the same sentence would have been reached.  The Superior Court concluded its discussion as

follows:

> In summary, I was aware at sentencing of the facts underlying the
> crimes that [Petitioner] pled guilty to and her background.
> [Petitioner] has not presented anything that materially changes what
> was presented to me at sentencing through the presentence report
> and the comments made by Trial Counsel and [Petitioner]. I find that
> Trial Counsel did a reasonable job investigating and presenting
> mitigating evidence at sentencing. There was more than enough
> mitigating evidence in the record to allow me to assess the moral
> culpability of Smith.

*Smith*, 2017 WL 902149, at *20.

The foregoing record demonstrates that the sentencing court considered both the nature of

the offense and Petitioner's character.  When considered in conjunction with the fact that

Petitioner's sentence was within the statutory limits, the Court concludes that the Superior Court

reasonably applied *Strickland* in holding that defense counsel's failure to file a direct appeal did

not amount to constitutionally ineffective assistance of counsel.

The Superior Court also rejected Petitioner's argument that defense counsel was ineffective

for failing to challenge her sentence as violating the Eighth Amendment.  As discussed later in this

Opinion, Petitioner's Eight Amendment argument lacks merit.  *See infra* at Section IV.B.  It is

well-settled that an attorney's failure to raise a meritless argument or objection does not amount to constitutionally ineffective assistance of counsel. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999). Therefore, the Court concludes that the Superior Court reasonably applied *Strickland* in holding that defense counsel's failure to raise a meritless Eighth Amendment violation argument on direct appeal did not amount to ineffective assistance.

Finally, the Superior Court held that defense counsel's presentation of the motion for modification of sentence was not constitutionally deficient. This decision was based on a reasonable application of *Strickland*. "Rule 35(b) . . . confers upon a sentencing trial judge considerable discretion over the appropriate grounds for a reduction of sentence." *State v. Lewis*, 797 A.2d 1198, 1201 (Del. 2002). As discussed later in this Opinion with respect to Claim Four, *see infra* at Section IV.B, defense counsel presented a comprehensive summary of the hardships Petitioner had faced in her life during Petitioner's sentencing hearing. In the motion for modification of sentence, defense counsel appropriately urged the Superior Court to reconsider Petitioner's sentence given all of the information he had previously provided and the fact that the sentence exceeded the SENTAC guidelines' presumptive sentences. (D.I. 17-3 at 60-62). The fact that defense counsel's argument was unsuccessful does not mean that counsel provided constitutionally ineffective assistance when presenting the motion for modification of sentence. Given these circumstances, the Court concludes that the Superior Court reasonably applied *Strickland* in rejecting Petitioner's argument that defense counsel's presentation of the motion for sentence modification was constitutionally ineffective.

For all of these reasons, the Court will deny Claim Three in its entirety.

### 3.    Claim Four:  Failure to Present Mitigating Evidence

In Claim Four, Petitioner contends that defense counsel provided ineffective assistance by failing to adequately investigate and present readily available mitigating evidence at sentencing.

(D.I. 17-2 at 68-77).  The Superior Court denied Claim Four during Petitioner's Rule 61 proceeding after finding that the vast majority of the mitigating information Petitioner claimed her counsel did not present was in fact presented at sentencing by counsel and in the PSI Report.  *See Smith*, 2017 WL 902149, at *14-20.  The Superior Court concluded that defense counsel reasonably investigated and presented mitigating evidence at sentencing, noting "[t]here was more than enough mitigating evidence in the record to allow [the judge] to assess the moral culpability of [Petitioner]."  *Id*. at *20.

To begin, the Court finds that the Superior Court reasonably determined the facts in concluding that the PSI Report and defense counsel himself actually did present most of the mitigating evidence Petitioner claimed defense counsel had failed to present at sentencing.  During the Rule 61 evidentiary hearing, Petitioner presented the testimony of Beth Cahill (Cahill), a mitigation specialist, to inform the Superior Court of additional mitigation evidence that defense counsel could have provided during sentencing.  (D.I. 17-4 at 71-134; D.I. 17-6 at 51-61).  According to Petitioner, Cahill testified to numerous other factors defense counsel either failed to present or merely touched upon at sentencing.  (D.I. 17-2 at 75).  The Superior Court, however, disagreed.  After setting forth a detailed explanation of the similarities and differences between the information provided at sentencing and the information provided by Cahill, the Superior Court explained that almost all of the events Cahill discussed were detailed in the reports provided to the trial court before sentencing,[8] and also noted that defense counsel commented on the same information during sentencing.  The Superior Court explained:

> In summary, I was aware at sentencing of the facts underlying the crimes that [Petitioner] pled guilty to and her background.

---

[8]    Petitioner testified at the Rule 61 hearing that she had been unable to disclose some of the sexual abuse she suffered until more recently.  (D.I. 17-4 at 360 of 432, 368-369).  She acknowledged that she was able to tell Cahill more because seven or eight years had passed and she had been through a lot of treatment.  (D.I. 17-4 at 368).

> [Petitioner] has not presented anything that materially changes what
> was presented to me at sentencing through the presentence report
> and the comments made by [Defense] Counsel and [Petitioner]. I
> find that [Defense] Counsel did a reasonable job investigating and
> presenting mitigating evidence at sentencing. There was more than
> enough mitigating evidence in the record to allow me to assess the
> moral culpability of Smith.

*Smith*, 2017 WL 902149, at *20.

Given the Superior Court's reasonable determination that the information in the PSI Report and the mental health evaluations was essentially the same as what was provided by Cahill during the Rule 61 hearing, the Superior Court reasonably applied *Strickland* in holding that defense counsel's presentation of the mitigation information during the sentencing hearing did not amount to constitutionally ineffective assistance.  Cahill may have interviewed more individuals and elaborated on the trauma Petitioner suffered while growing up, but the Superior Court had already been well-informed of the important mitigating information via the PSI Report and the information provided by defense counsel at sentencing.  Although defense counsel may not have obtained all of the reports and information acquired by Cahill, he still managed to provide the sentencing court with a broad picture of the challenges Petitioner faced in her life.  In short, defense counsel's failure to present more detail and witnesses to corroborate the already comprehensive information provided to the sentencing court did not fall below an objective standard of reasonableness. Accordingly, the Court will deny Claim Four.

### B.      Claim Two:  Eighth Amendment Violation

In Claim Two, Petitioner contends that her life sentence for second degree murder violates the Eight Amendment prohibition against cruel and unusual punishment.  She asserts that her sentence is grossly disproportionate to her crime because "similarly situated defendants have served an average of 23 years[, and t]he average sentence for female defendants in Delaware is 19.6 years."  (D.I. 3 at 8; D.I. 17-2 at 45, 47-51, 53, 57-60).  The Superior Court denied Claim

Two as meritless.  Therefore, Petitioner will only be entitled to habeas relief if the Superior Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The Eighth Amendment forbids cruel and unusual punishment, and it applies to states via the Fourteenth Amendment.  *See Robinson v. California*, 370 U.S. 660, 667 (1962).  Two decisions of the United States Supreme Court summarize the applicable Eighth Amendment principles for non-capital sentencing: *Lockyer v. Andrade*, 538 U.S. 63 (2003) and *Ewing v. California*, 538 U.S. 11 (2003).  In *Lockyer*, the Supreme Court extensively reviewed its prior cases dealing with Eighth Amendment challenges to criminal sentences, and concluded that it has "not established a clear and consistent path for courts to follow [in determining whether a particular sentence for a term of years can violate the Eighth Amendment]."  *Lockyer*, 538 U.S. at 72.  The *Lockyer* Court explained that, for the purposes of analyzing an Eighth Amendment claim under § 2254(d)(1), the only clearly established governing legal principle is that "the gross disproportionality principle, the precise contours of which are unclear, [is] applicable only in the 'exceedingly rare' and 'extreme' case."  *Id*.  The *Lockyer* Court then held that a recidivist's minimum sentence of fifty years was not grossly disproportionate to the two counts of petty theft offenses that triggered the application of the recidivist statute.  *Id*. at 67, 77.

In *Ewing*, the Supreme Court rejected the defendant's claim that a sentence of twenty-five years to life for stealing three golf clubs was "grossly disproportionate" to the crime.  *See Ewing*, 538 U.S. at 20, 28.  The *Ewing* Court reiterated that the Eighth Amendment "contains a 'narrow proportionality principle' that 'applies to noncapital sentences,'" *id*. at 20, which "does not require strict proportionality between the crime and the sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Id*. at 23.  The *Ewing* Court explained that a court engaging in the proportionality analysis must compare the harshness of the penalty imposed upon the defendant with the gravity of his triggering offenses and criminal history.  *Id*. at 28-29.  "In

weighing the gravity of [the defendant's] offense, [the court] must place on the scales not only his current felony, but also his long history of felony recidivism." *Ewing*, 538 U.S. at 29.

When deciding that Petitioner's sentence did not violate the Eighth Amendment, the Superior Court cited to *Crosby v. State*, in which the Delaware Supreme Court announced a two-part test to determine whether a sentence constituted cruel and unusual punishment:

> To determine whether a particular sentence is prohibited, this Court must undertake a threshold comparison of the crime committed and the sentence imposed. If such a comparison leads to an inference of gross disproportionality, then this Court must compare [the defendant's] sentence with other similar cases to determine whether the trial court acted out of step with sentencing norms.

*Crosby v. State*, 824 A.2d 894, 908 (Del. 2003). When establishing the test in *Crosby*, the Delaware Supreme Court relied upon United States Supreme Court precedent, including *Ewing*, *Harmelin v. Michigan*, 501 U.S. 957 (1991), and *Rummel v. Estelle*, 445 U.S. 263 (1980). Given these circumstances, the Court concludes that the Superior Court's denial of Claim Two was not contrary to clearly established Federal law. *See Fahy v. Horn*, 516 F.3d 169, 196 (3d Cir.2008) (Supreme Court of Pennsylvania's decision was not "contrary to" clearly established Federal law because it appropriately relied on its own state court cases, which articulated the proper standard derived from Supreme Court precedent); *see also McCleaf v. Carroll*, 416 F.Supp.2d 283, 290 (D. Del. 2006) (noting "[t]he Delaware Supreme Court's reliance on *Rummel* was consistent with the Supreme Court's pronouncements in both *Lockyer* and *Ewing*.").

In addition, the Court concludes that the Superior Court did not unreasonably apply Supreme Court precedent when concluding that Petitioner's case was not so extraordinary or extreme as to satisfy the threshold inference of "gross proportionality" needed to establish an Eighth Amendment violation. *See Lockyer*, 538 U.S. at 77. For instance, in *Lockyer*, the Supreme Court held that a recidivist's minimum sentence of fifty years was not grossly disproportionate to

the two counts of petty theft offenses that triggered the application of the recidivist statute.  *See*
*Lockyer*, 538 U.S. at 67, 77.   Similarly, in *Ewing*, the Supreme Court rejected an Eighth
Amendment challenge after determining that the defendant's sentence of twenty-five years to life
for stealing three golf clubs was not "grossly disproportionate" to the crime.  *See Ewing*, 538 U.S.
at 21-23.   Finally, in *Rummel*, 445 U.S. 263, the Supreme Court held that a recidivist's life
sentence, with the possibility of parole, did not constitute cruel and unusual punishment even
though the sentencing range for the triggering offense, obtaining $120.17 by false pretenses, was
two to ten years imprisonment.

In this case, Petitioner pleaded guilty to second degree murder.  The statutory penalties for
that offense, which is a Class A felony, range from a minimum of fifteen years to a maximum life
term. *See* 11 Del. C. §§ 635, 4205(b)(1).  After explaining that the "Eighth Amendment does not
require strict proportionality between crime and sentence," but rather, "it forbids only extreme
sentences that are grossly disproportionate to the crime," the Superior Court held:

> This case involved a senseless killing that arose out of a verbal
> disagreement between [Petitioner] and the Victim. The genesis of
> the argument started with [Petitioner] shooting a gun in front of the
> Victim's car the night before in Carvel Gardens. One of the
> witnesses to the shooting at Seaford Meadows described [Petitioner]
> as the aggressor in the verbal argument. Despite the fact that the
> Victim never threatened [Petitioner], she got out of her car, walked
> over to his car, stuck her gun through his open window, and shot the
> Victim three times while he was frantically trying to get away from
> her. Indeed, [Petitioner] shot the Victim once in the back. The
> Victim was only 18-years-old when he died. The Victim's father
> spoke at sentencing. The Victim was his only son. The Victim's
> father spoke about how he and his family were devastated by what
> happened to the Victim. There is no doubt that the Victim's father
> and family will never enjoy their lives as much as they should have
> because of what [Petitioner] did. While [Petitioner] had a horrible
> life, as I was well aware of at sentencing, the facts of her case
> demonstrate the sentence she received is appropriate for what she
> had done. I conclude that Trial Counsel's decision not to file an
> appeal of [Petitioner's] sentence was appropriate.

*Smith*, 2017 WL 902149, at *22.

Given the Supreme Court's decisions in *Lockyer*, *Rummel,* and *Ewing*, the Court concludes that the Superior Court reasonably applied clearly established Federal law in holding that Petitioner's sentence did not create an inference of gross disproportionality.  Accordingly, the Court will deny Claim Two for failing to satisfy § 2254(d)(1).

## V.      CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011).  A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition fails to warrant federal habeas relief, and is persuaded that reasonable jurists would not find this conclusion to be debatable.  Therefore, the Court will not issue a certificate of appealability.

## VI.     CONCLUSION

For the reasons stated, the instant Petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied without an evidentiary hearing or the issuance of a certificate of appealability.  An appropriate Order shall issue.